# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

In the Matter of the Search of:

Three devices more fully described in Attachment A.

)
)
)
)
)
)

Case No. 19-MJ-1211

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A.

over which the Court has jurisdiction pursuant to Title 18, United States Code, Sections 2703 and 2711, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:
Title 18, United States Code, Sections 924(c), 1951, 2113, 2119

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Martin Keck, TFO
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: 3/4/19

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin

William E. Duffin, U.S. Magistrate Judge
*Printed Name and Title*

# AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Martin Keck, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a federally deputized Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI). I have been a TFO with the FBI since 2018. I have been employed as a law enforcement officer with the Wauwatosa Police Department for over 12 years. I have investigated bank robberies, business robberies, and carjackings, and have been involved in search warrants and interrogations regarding these various offenses. In many cases, I have worked jointly with other local, state, and federal law enforcement partners.  I have participated in numerous armed bank robbery, commercial robbery, and carjacking investigations in violation of Title 18, United States Code, Sections 924(c), 1951, 2113, 2119, and other related offenses.  I have also received formal training regarding the same.

3.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

1

4.     The facts in this affidavit come from my personal observations, my training and experience, information obtained from witnesses, and information obtained from other agents during the course of their official duties, all of whom I believe to be truthful and reliable.

5.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

6.     The property to be searched is described as follows:

  a.     One Black LG smart phone, hereinafter "**Device #1**";

  b.     One Blue and Black Alcatel flip phone, hereinafter "**Device #2**";

  c.     One Black LG smart phone, hereinafter "**Device #3**."

7.     The **Devices** are currently located at the Wauwatosa Police Department, 1700 N. 116th Street, Wauwatosa, WI, 53226, under Wauwatosa Police Inventory #19-000665, item numbers 001-003.

8.     The applied-for warrant would authorize the forensic examination of the **Devices** for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

9.     The United States is investigating Ja'Juan W. Payne and Tongon M. Scott concerning possibly violations of Title 18, United States Code, Section 1951(a)

2

(Hobbs Act Robbery); and Title 18, United States Code, Sections 924(c) and 2 (use of a firearm during a crime of violence).

10. On February 10, 2019 at approximately 6:36 a.m., West Allis Police Officers responded to the Speedway gas station, located at 9111 W. National Avenue, in the city of West Allis, County of Milwaukee, State of Wisconsin, to investigate an armed robbery complaint. The West Allis Police Dispatch Center advised the offender in the armed robbery was a black male, who displayed a handgun, and was last seen in a dark blue or black mini-van. West Allis Police Officers responded to the business at which time the West Milwaukee Police Department advised they located the suspect vehicle and initiated a vehicle pursuit.

11. Law enforcement spoke with the assistant manager of the business, A.V., and employee, T.L., who was working as a cashier. A.V. said she was working the cash register when an unknown suspect described as a black male, unknown age, 6'01" tall, 160-165 pounds, wearing a blue winter jacket, blue ski mask, and white gloves entered the store. A.V. stated the suspect approached the cashier register area and displayed a black handgun with an extended magazine and pointed the firearm at her. The suspect told A.V. "Give me all the money" and "Underneath the drawer too." A.V. opened her cash register and handed the suspect an estimated $200 in U.S. Currency. A.V. stated a citizen inside the store approached the suspect from behind and hit the suspect in the head with a glass Starbucks coffee drink. A.V. stated the suspect ran out of the store and she did not know where he went from there. A.V. stated there was a blue Caravan parked directly in front of the business

3

when this happened and the vehicle fled in an unknown direction when the suspect ran. A.V. said the citizen did not remain on scene and she does not know the identity of the citizen. A.V. did not consent to being robbed.

12.     T.L., the cashier employed at Speedway, advised law enforcement that she is the first shift cashier and started work at 6:00 a.m. on February 10, 2019. T.L. said she was behind the counter when a male, 6' tall, 180 pounds with layers on, wearing a ski mask, hoodie, black gloves, blue coat, shiny sunglasses, and holding a black gun with an extended magazine came into the store. T.L. stated the male told her to "Give me the money, open the register." T.L. stated she unlocked the register and gave the male the money. The suspect then told T.L. he wanted to look inside the register, so she pulled out the drawer of the register. She stated the male put the money into his pocket. During this time, she stated there was a customer inside the business. The customer came toward the male and threw a bottle at the suspect. She stated at that point, she and A.V. both ducked behind the counter and did not see where the offender went. T.L. stated she asked the male who threw the item at the offender to remain on scene but he left before officers arrived on scene.

13.     A receipt from the Speedway store reflects that a total amount of $227.09 in U.S. Currency was stolen during the robbery.

14.     Video surveillance was obtained from Speedway Gasoline Station located at 9111 W. National Avenue on the morning of February 10, 2019. I reviewed this video surveillance, which depicts a dark-colored minivan pull up to the Speedway in front of the business. A subject exited the front passenger's side door

4

and walked toward the entrance. During the robbery, the suspect was wearing a white glove(s) and holding an object that appears to be a black pistol with a long extended magazine. The offender was wearing a blue jacket with the hood up (over the head) and black shoes. The video captures the cashiers giving the robber money at gunpoint. The video footage further depicts a male in the store approach the robber and strike him over the head with what was later identified as a glass bottle. Finally, video from the exterior of the store depicts the robber running from the store and crossing the parking lot on foot, with the dark-colored van following behind.

15.    A West Milwaukee Police Officer located the suspect vehicle, later identified as a 2014 Dodge van, blue in color, (VIN 2C4RDGCG7ER349859), traveling eastbound on W. National Avenue through the green light at W. Greenfield Ave. The officer began following behind the van, eastbound on W. National Avenue. The van drove through a red light at S. 60th Street, at which point the officer activated the emergency lights and sirens on his fully marked police vehicle. The officer's pursuit of the van lasted approximately 3 minutes and went a distance of approximately 3.6 miles. The van reached speeds in excess of 100 MPH on city streets. The van ultimately crashed at 1653 S. 25th Street in the City of Milwaukee. Two male occupants fled the vehicle upon the crash.

16.    A foot chase of the two male suspects then ensued. Officers from the West Allis Police Department, the Milwaukee County Sheriff's Office, the Milwaukee Police Department and the West Milwaukee Police Department responded to the area and located the two suspects. One suspect, identified as Ja'Juan W. Payne, was

located in the yard at 1646 S. 26th Street. After a physical altercation with Payne, officers arrested him. At this time, he was wearing a blue jacket, black pants, and black shoes. He was observed with a laceration on his head that was bleeding. Payne stated that the cut to his forehead was from when he was hit on the head with a bottle. Payne was taken to the West Allis Medical Center for medical evaluation and treatment.

17.     Upon a search of Payne at the medical center, officers recovered from Payne's right rear pocket a black LG smart phone, **Device #1**, which was seized as evidence. Additionally, near the location of Payne's arrest, officers found a blue and black Alcatel flip style cell phone, **Device #2**, in the bushes in front of 1646 S. 26th Street, which was ringing. This phone was also seized as evidence.

18.     With respect to the second suspect, a citizen at 1737 S. 25th Street shouted to officers a subject was in her backyard. As the citizen was informing the officers, the suspect fled from the backyard to S. 25th Street. Officers began pursuing the suspect on foot. The second suspect, identified as Tongon M. Scott, was taken into custody at 1814 S. 24th Street in the City and County of Milwaukee.

19.     After clearing from Speedway located at 9111 W. National Avenue, law enforcement responded to the vehicle crash scene located in the City and County of Milwaukee and observed the blue Dodge Caravan with no rear registration plate displayed. This vehicle appeared to be the same vehicle observed in the video surveillance and that which was described by the citizen witness he spoke to.

6

20.     The van used in the armed robbery was listed as stolen with the Milwaukee Police Department on January 11, 2019.

21.     Law enforcement recovered the following from the Dodge Caravan: a black wallet on the driver's seat of the minivan containing a Wisconsin photo identification paper for Tongon M. Scott; a black LG smart phone in the center console, **Device #3**; one pair of white gardening style gloves from the center console; a matching pair of white gloves from the front passenger door; a pair of reflective style sunglasses on the front passenger floor board; and a longer black hat from the third row bench seat.

22.     Law enforcement also recovered a $5 bill approximately 20 feet west of the van's resting location. Approximately 50 feet in front of the $5 bill was a separate $1 bill. Law enforcement also recovered a $10 bill in front of 2518 W. Mitchell Street.

23.     Additionally, recovered under exterior steps behind 1642 S. 26th Street in the City and County of Milwaukee was a pile of cash under a wooden set of stairs leading from the exterior door to the residence. The space under the steps was covered by a wooden lattice on both sides. Located on the south side of the steps was a $5 bill in the snow against the lattice. Upon further inspection, a pile of loose cash totaling $232 that had been stuffed under the steps through the 3" by 3" gaps in the lattice was observed.

24.     Law enforcement also searched the gang way between 1626 S. 26th Street and 1630 S. 26th Street, which was in Payne's attempted escape path. Law

7

enforcement located and recovered a black semi-automatic pistol with a 31 round extended magazine inserted in a basement window well located on the north side of 1630 S. 26th Street in the City and County of Milwaukee. The firearm is more specifically described as a Glock 26 9mm compact semi-automatic pistol bearing serial number ZME427. The inserted magazine contained 31 rounds of 9 mm ammunition and there was one round of ammunition chambered in the firearm. The firearm matches the victims' description of the gun used in the robbery. It is also consistent with the gun depicted on the Speedway surveillance footage.

25. A Wisconsin criminal history check indicates that Ja'Juan W. Payne is a convicted felon.

26. On or about February 10, 2019, after Payne was medically cleared from Aurora West Allis Medical Center, he was conveyed to the West Allis Police Department at which time officers positively identified Payne's identity through the Morpho Fingerprint Machine.

27. On or about February 10, 2019, co-actor Scott gave a *Mirandized* statement wherein he stated that he stole the blue minivan a few weeks before the Speedway robbery. He identified Payne and further stated that Payne said in the van that he was going to "hit" the Speedway. Scott admitted knowing that he thought it meant Payne would rob the store, although he stated he thought it was a "joke." On this same date, Scott provided verbal and written consent to search his cellular phone (**Device #3**). Scott provided a corresponding telephone number for his cellular phone of (414) 856-6024 and the pass code.

28.     Investigators from the West Allis Police Department applied for and were granted a search warrant authorizing a search of **Devices #1** and **#2**. The warrant was signed by the Honorable Janet Protasieciwz, Judicial Court Judge of the First Judicial District of Wisconsin, on February 19, 2019.

29.     Forensic examinations of **Devices #1** and **#2** were attempted; however, both **Devices** were password protected and law enforcement was unable to bypass the passcodes. Therefore, an extraction of data using the Cellebrite software was unsuccessful. The search warrant for **Devices #1** and **#2** was returned in state court as indicating the above results.

30.     A forensic examination of **Device #3** was conducted utilizing the Cellebrite software. The examination, however, did not result in the extraction of data from certain web-based applications, which was confirmed upon a physical examination of **Device #3**.

31.      I am aware there are additional means in extracting data from cellular devices. I am aware that additional attempts to unlock and examine the **Devices** can be made by trained cellular device examiners.

32.     I am also aware of the existence of additional computer software that is used to extract data from phones, such as the Black Bag Technologies Black Light software, which was not used during the initial forensic examination the **Devices**.

33.     The **Devices** are currently in storage at Wauwatosa Police Department, 1700 N. 116th Street, Wauwatosa, WI, 53226. In my training and experience, I know that the **Devices** have been stored in a manner in which its contents are, to the

9

extent material to this investigation, in substantially the same state as they were when the **Devices** first came into the possession of the Wauwatosa Police Department.

## TECHNICAL TERMS

34.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.     Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.   A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.   In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.     Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.     Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.     GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or

locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

      e.    PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.     Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.     IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.     Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

35.    Based on my training, experience, and research, I know that the **Devices** have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.   In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

36.    Based on my knowledge, training, and experience, as well as my conversations with other Special Agents of the Federal Bureau of Investigation who are experienced with electronic communication systems, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

12.    There is probable cause to believe that things that were once stored on the **Devices** may still be stored there, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

14

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

13.      *Forensic evidence.* As further described in Attachment B, this applications seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Devices** were used, the purpose of use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the **Devices** because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.     Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely

16

reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

37. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

38. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Devices** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to, computer-assisted scans of the entire medium that might expose many parts of the **Devices** to human inspection to determine whether it is evidence described by the warrant.

39. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is a reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

40.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Devices** described in Attachment A to seek the items described in Attachment B.

**Attachment A**

The property to be searched is described as follows:

1. One Black LG smart phone, hereinafter "**Device #1**";

2. One Blue and Black Alcatel flip phone, hereinafter "**Device #2**";

3. One Black LG smart phone, hereinafter "**Device #3**."

The **Devices** are currently located at the Wauwatosa Police Department, 1700 N. 116th Street, Wauwatosa, WI, 53226, under Wauwatosa Police Inventory #19-000665, item numbers 001-003.

This warrant authorizes the forensic examination of the **Devices** for the purpose of identifying electronically stored data particularly described in Attachment B.

1

**Attachment B**

1.     All records on the **Devices** described in Attachment A that relate to violations of Title 18, United States Code, Section 1951 (Hobbs Act robbery); and Title 18, United States Code, Section 924(c) (use of a firearm during a crime of violence) and involve Tongon M. Scott and Ja'Juan W. Payne, including, but not limited to the following:

    a.  any information related to possession of firearms (including photographs, text messages, emails, or any other communication information);

    b.  any information related to the accruing of robbery proceeds (including photographs, text messages, emails, or any other communication information);

    c.  any information recording any targets' schedule or travel on and around February 10, 2019;

    d.  any web search information related to the offenses described above;

    e.  photographs of locations evidencing pre-robbery surveillance;

    f.  any communications via text messages, email, Facebook, Twitter, or other web-based applications between the subjects and others regarding the offenses described above; and

    g.  all bank records, checks, credit card bills, account information, and other financial records.

2.     Evidence of user attribution showing who used or owned the **Devices** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the

1

foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of electronic storage and any photographic form.